Terence L. Rooney (#5789)
trooney@grossrooney.com
J. Adam Sorenson (#16577)
asorenson@grossrooney.com
GROSS & ROONEY
215 South State Street, Suite 800
Salt Lake City, Utah 84111
Telephone: 801-935-4611
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JANE DOE C.O. & JANE DOE S.D., <br><br> Plaintiffs, <br> v. <br><br> UTAH VALLEY UNIVERSITY; DERRICK PICKERING; and JOHN DOES 1–10, <br><br> Defendants. | **COMPLAINT AND JURY DEMAND** <br><br> Case No. <br> Judge: |

Plaintiffs Jane Doe C.O. and Jane Doe S.D.,[1] by and through undersigned counsel, hereby complain, allege, and aver against Defendants Utah Valley University ("UVU"); Derrick Pickering ("Pickering"); and John Does 1–10 (collectively "Defendants") as follows:

## INTRODUCTION

1. People are rarely more vulnerable than when they are in an exam room with a health care provider—a person society tells everyone to trust and respect. **Derrick Pickering took advantage of his position as a health care provider, Plaintiffs' vulnerability, and the relationship of trust inherent in his profession, as he sexually battered and abused Plaintiffs.** As though this abuse was not enough, UVU learned of the abuse, failed to properly

---

[1] As victims of sexual abuse, Plaintiffs seek to proceed by pseudonym, but provided their full names and information to Defendants, so that they may prepare their defenses.

investigate the claims as required by Title IX, and acted in a way which furthered Pickering's fraudulent concealment of the abuse. UVU's failures were the second betrayal Plaintiffs experienced, and led to years of mental and emotional suffering. "There is no doubt regarding the depravity of a sexual predator, but the enabler is only half a step behind." AMOS N. GUIORA, ARMIES OF ENABLERS, 28 (ABA Publishing 2020).

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it involves violations of Title IX of the Education Amendments of 1971, 20 U.S.C. § 1681 *et seq*. ("Title IX").

3. Pursuant to 28 U.S.C. Section 1367(a), this Court has supplemental jurisdiction over the non-Title IX claims brought herein as they form part of the same case or controversy and are substantially related to the claims over which this Court has original jurisdiction under Title IX.

4. Since Plaintiffs claims are brought against a state entity, Plaintiffs served UVU with notices of claim pursuant to the Utah Governmental Immunity Act, Utah Code Section 63G-7-401 *et seq*. on January 16, 2024, and April 30, 2024. Therefore, all state statutory conditions precedent to the commencement of this action have been met.

5. Venue in this action is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391.

## PARTIES

6. Plaintiff Jane Doe C.O. is a resident of Utah County, Utah, and was a student at UVU at all times relevant to the claims set forth herein.

7. Plaintiff Jane Doe S.D. is a resident of Whatcom County, Washington, and was a student at UVU at all times relevant to the claims set forth herein.

8. Defendant UVU is a State University which receives federal financial assistance and was, therefore, subject to the requirements of Title IX of the Education Amendments of 1971, 20 U.S.C. § 1331 *et seq.*

9. Upon information and belief, Defendant Pickering is a resident of Salt Lake County, Utah.

10. During all relevant times, Pickering was a UVU employee.

## GENERAL ALLEGATIONS

**Jane Doe C.O.**

11. Around June 2016, Jane Doe C.O. was preparing to serve a volunteer proselyting mission for The Church of Jesus Christ of Latter-day Saints.

12. As part of the preparation process, Jane Doe C.O. needed to complete a mission physical form.

13. In order to complete this form/physical, Jane Doe C.O. scheduled a physical with UVU Student Health Services where Pickering was an APRN.

14. This was the only place Jane Doe C.O. could obtain a physical because she was an international student with health insurance through UVU which limited her access to other health care entities.

15. Jane Doe C.O.'s understanding of the physical was that it required a doctor to check several labs, her weight, vitals, and a general check for any anomalies in her heart or lungs.

16. When she arrived, Pickering came into the room and said that he needed to check Jane Doe C.O.'s breasts and also perform a pap smear.

17. Jane Doe C.O. said that is not what she understood as being required.

18. Pickering suddenly began acting forceful about doing a pap smear, told Jane Doe C.O. it was required, and said Jane Doe C.O. had no other option if she wanted him to sign off on her physical.

19. Jane Doe C.O. asked him why this was required and kept saying that she did not think it was correct and she did not want them.

20. Pickering, however, said people her age (she was 27 at the time) had to have a pap smear before their mission physical form could be signed.

21. Jane Doe C.O. responded that she did not need a pap smear and did not want one performed, but Pickering again insisted that he would not sign her mission paperwork unless he performed the pap smear and breast examination.

22. Pickering then put a separate form in front of Jane Doe C.O. which he said was a consent form for the pap smear and breast exam.

23. He told her to sign it or he would not complete her physical and sign the mission physical form.

24. Jane Doe C.O., who was not offered or provided with a translator, whose first language was not English, and who felt like he was going to stop her from going on her mission if she did not agree, felt confused and pressured.

25. She said she felt like she had no option but to trust him as a health care provider or be denied the opportunity to serve a mission.

26. Because of this duress, and Pickering's insistence that she could not go on her mission without a pap smear, Jane Doe C.O. signed the form.

27. Pickering then allegedly performed a pap smear, but it was very uncomfortable, and Jane Doe C.O. felt like something was wrong.

28. She felt confused, overwhelmed, and felt Pickering was doing something to her against her will.

29. Jane Doe C.O. felt violated.

30. Pickering then touched her breasts as part of what he called a breast exam, and did so in a way that left Jane Doe C.O. feeling violated.

31. When Pickering finished, Jane Doe C.O. was crying.

32. Pickering then told Jane Doe C.O. that her iron levels were low, so she had to return to get iron shots.

33. Later that day, Jane Doe C.O. went to exercise, but could not because she was in too much pain and began bleeding.

34. Jane Doe C.O. returned three times to Pickering for iron shots.

35. Each time Pickering told Jane Doe C.O. that her veins were too small, so he had to give them to her in her buttocks. He then asked her to pull her pants down.

36. Jane Doe C.O. felt similar to when Pickering allegedly performed the pap smear and breast exam, but she pushed away those feelings and trusted that Pickering was a health care provider and knew what he was doing.

37. One year later, Jane Doe C.O. presented to the same office at UVU health services because she was preparing to get married and needed a prescription for birth control.

38. A health care provider named Esme met with her, and Jane Doe C.O. asked her a question about sexual intercourse, explaining that she had a pap smear for her mission physical that she did not want, and that was a very traumatic experience.

39. Esme seemed surprised by this, and Jane Doe C.O. explained that Pickering told her a pap smear was required and he would not sign the physical form if she did not let him perform it.

40. Esme then went and grabbed a mission physical form and showed Jane Doe C.O. that, because Jane Doe C.O. was under 40 and healthy, the pap smear was an optional part of the physical/form.

41. When Jane Doe C.O. heard this, she broke down crying as all of the feelings of being forced into having a pap smear done and being violated and in pain rushed back. She then saw how Pickering took advantage of her religious conviction to serve a mission, her age, her international student status, the fact that English was a second language for her, and her inexperience with gynecological care and requirements and used those things against her.

42. She still did not appreciate fully the abuse she endured, but she felt like something was wrong.

43. So, on February 8, 2018, Jane Doe C.O. reported the incident to UVU police. In the police report, the investigating officer stated that he told Jane Doe C.O. his opinion was that she did not have a claim:

> I asked Carol to clarify what exactly she wished for our office to investigate regarding her complaint that I wasn't seeing a criminal matter. . . . After clarifying that nothing inappropriate took place during the exam constituting a criminal case and that Carol was merely complaining that the exam should have never taken place, I referred her to contact the Director of Health Service. This was to assist Carol in pursuing her complaint, as she was wishing to do. At this time there is nothing criminal to investigate further involving our office.

44. An officer then noted that he spoke to Bill Erb, the Director of Student Health services, and the complaint was also dismissed by Mr. Erb:

> I spoke to Bill Erb, who is the Director to Student Health Service. He stated that Carol came in months ago and expressed that she was uncomfortable that the test was done. He was comfortable that his nurse practitioner followed established recommended professional medical guidelines after the consent was given.

45. The complaint disposition was then changed to "unfounded," and Jane Doe C.O. was told that what she experienced was just medical care.

46. What UVU failed to tell Jane Doe C.O. was that she was not the first student to file a criminal complaint alleging Pickering sexually abused her.

47. UVU also failed to tell her about other complaints and concerns expressed by employees regarding Pickering's actions.

48. UVU then failed to tell Jane Doe C.O. about her Title IX rights, and all of the mandatory reporters who were informed of Jane Doe C.O.'s complaint appear to have failed to report the complaint to UVU's Title IX office.

49. As a result, no Title IX investigation took place, and Pickering continued to work at UVU.

50. Pickering's abuse, which he disguised as medical care, was further concealed and covered up by UVU, as Pickering, the police, and UVU told Jane Doe C.O. that what she experienced was medical care, not abuse.

51. But Pickering sexually abused Jane Doe C.O.. He hid and disguised that sexual abuse under the guise of medical care, and his actions were performed for his own sexual gratification, and not in an effort to provide care.

52. These acts of sexual abuse were further concealed by UVU's failure to properly investigate Jane Doe C.O.'s claim, failure to follow its own mandatory reporting and Title IX requirements, and failure to initiate and perform a Title IX investigation.

53. These failures were compounded when UVU's employees and agents told Jane Doe C.O. over and over that her complaint was unfounded, that she had no claim, and that what she experienced was just medical care.

54. Jane Doe C.O. was a young international student, who spoke English as a second language, had little to no experience with obstetrical or gynecological care, and whose religious beliefs were used against her. Pickering was the perpetrator of the abuse that followed, and UVU enabled that abuse.

**Jane Doe S.D**

55. In 2018, Jane Doe S.D., a UVU student, went to the University Health Center to get established with a provider in order to manage her prescriptions.

56. She also had a friend who was diagnosed with polycystic ovary syndrome ("PCOS"), and she wanted to find out if she had it.

57. When Jane Doe S.D. presented and began filling out an intake for counseling and for the health center, the form she was filling out asked if she had been sexually assaulted.

58. Jane Doe S.D. marked "yes" because she was raped in June 2018 in Washington.

59. When Jane Doe S.D. went into a room for her appointment, Pickering entered, talked to Jane Doe S.D. about PCOS, ordered a blood test, and filled out prescriptions for Jane Doe S.D.'s medication refills.

60. Pickering then commented that he noticed her form said she had been sexually assaulted and asked when it happened.

61. Pickering then asked if she had been tested for sexually transmitted diseases since the assault.

62. Jane Doe S.D. told him she had not been tested, and Pickering told her he could do it right then if she wanted.

63. Pickering then stood up like she needed to decide right then or the appointment was over, and Jane Doe S.D. said "sure."

64. Pickering brought Jane Doe S.D. a paper gown and told her to put the cut out on the front so he could do a breast exam before the pap smear.

65. When he came back in the room, he stood on her left side and opened up the paper gown to expose both of her breasts at the same time.

66. Jane Doe S.D. remembers Pickering looking directly at her breasts and then palpating both breasts like a normal test.

67. Then, he kept his hand flat like he was going to palpate her breasts again, but instead of palpating her breasts, he lightly ran his fingers around her areolas.

68. After running his fingers around Jane Doe S.D.'s areolas, Pickering palpated both breasts a second time and then formed his hand in a "C" shape and pressed the "C" shape against her ribs so that her left breast was sitting in his hand.

69. Next, with her breast sitting in his hand, Pickering jiggled his hand back and forth, causing her breast to shake.

70. Pickering then told Jane Doe S.D. to scoot forward for the pap smear, lifted up her gown, and looked at her labia.

71. Throughout this whole process, Pickering said nothing, then took the pap smear and left. Jane Doe S.D. put her clothes on and left the health center.

72. Jane Doe S.D. remembers feeling uncomfortable as she left. She felt like she fought in her head about how uncomfortable the situation was, and she thought back to determine what each touch was for.

73. Over the next few years, the incident popped into her head often. Jane Doe S.D. thought, until years later at another OBGYN appointment during a breast exam, that the "exam" stood out to her because it caused her nipples to harden and left her feeling embarrassed. She later realized it stood out because the latter portion was not part of an exam.

74. Years later, at another appointment, the doctor administered a breast exam by carefully lifting the gown away from her chest so he could reach her breast, but he did not fully expose either breast at any time, and he did not look at them. He then quickly palpated both breasts one at a time and then replaced her gown. When he finished, she felt the blood in her face drain as she thought of what Pickering did.

75. Even then, it was only when Jane Doe S.D. saw the Salt Lake Tribune's social media post that the true nature of what Pickering did hit her.

76. As she saw the post with a picture of a Utah woman sexually assaulted by her doctor, the incident at UVU floated to her mind and the next slide was a photo of UVU and her heart sank.

77. She realized at that moment that it was not just a weird or awkward appointment. Her feelings were not because she was on edge because of past traumatic experiences, it was because Pickering took advantage of his position as a health care provider and Jane Doe S.D.'s recent traumatic experience to sexually abuse her.

78. Pickering sexually abused Jane Doe S.D., just as he abused others. He hid and disguised that sexual abuse under the guise of medical care, but his actions were performed for his own sexual gratification, and not in an effort to provide care.

79. To compound and enable that abuse, UVU failed to investigate past claims and complaints from employees against Pickering, failed to follow its own mandatory reporting and Title IX requirements, and failed to initiate and perform a Title IX investigation, or an investigation of any kind.

80. If UVU listened to the prior complaints and followed the policies it agreed to follow, Pickering would not have been working at the health center when Jane Doe S.D. presented to it that day, and he would not have been able to sexually abuse her.

**FIRST CAUSE OF ACTION**
**(Violations of Title IX, 20 U.S.C. §1681(a) *et seq.*)**

81. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

82. Under Title IX, "No person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[2]

83. Plaintiffs were UVU students at the time of the actions giving rise to the claims in this case.

84. UVU receives federal financial assistance for its education program and is, therefore, subject to the provisions and requirements of Title IX.

---

[2] 20 U.S.C. § 1681(a) (stating that sexual harassment under Title IX includes unwanted sexual advances, rape, and/or sexual assault).

85. Under Title IX, UVU is required to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

86. Pickering's conduct described above constitutes sexual harassment, abuse, assault, and sex discrimination under Title IX.

87. A number of mandatory reporters failed to report Plaintiff Jane Doe C.O.'s claims to the Title IX office and proper authorities at UVU, and UVU was put on notice of Pickering's conduct as set forth above.

88. Once on notice, UVU had a responsibility to investigate and make a reasonably diligent inquiry into the allegations and remedy the abuse.

89. UVU, however, failed to conduct a Title IX investigation into Plaintiff Jane Doe C.O.'s claims against Pickering. To the extent any form of investigation took place, it did not comply with Title IX's requirements or UVU's own Title IX requirements.

90. UVU also failed to properly train school law enforcement personnel on UVU's grievance process and all other procedures used for investigating reports of sexual violence.

91. In so failing, UVU was deliberately indifferent to the sexual abuse Plaintiffs experienced—sexual abuse which was severe, pervasive, and so objectively offensive that it deprived Plaintiffs of access to the educational benefits or opportunities provided by UVU.

92. As a direct and proximate result of UVU's actions and/or omissions, Plaintiffs experienced mental and emotional distress which interfered with their education and caused pain and suffering for which general damages should be awarded.

93. To compound its failures, UVU told Plaintiff Jane Doe C.O. what she experienced was not abuse, thereby fraudulently concealing the criminal acts she endured.

94. UVU also made its failures worse as it kept Pickering in its employ, allowed him continued affiliation with UVU and its facilities, failed to properly discipline him; and enabled additional abuse.

## SECOND CAUSE OF ACTION
**(Sexual Battery against Pickering)**

95. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

96. In performing the acts described herein, Pickering acted with the intent to cause a harmful and offensive contact with Plaintiffs' persons.

97. On each occasion, Pickering did, in fact, bring himself into offensive and unwelcome contact with Plaintiffs

98. At all relevant times, Plaintiffs found the contacts by Pickering to be offensive to her person and dignity, and at no time did Plaintiffs knowingly consent to any of those offensive acts.

99. Pickering also failed in the following ways:

   a. Causing a harmful and offensive contact with Plaintiffs' persons;
   b. Sexually abusing Plaintiffs;
   c. Committing acts against Plaintiffs which were not medically necessary—acts of sexual battery which he knowingly and intentionally performed for no other reason than his own sexual gratification.
   d. Fraudulently concealing his actions under the guise of medically necessary care, shattering Plaintiffs' trust in health care providers, and committing these wrongful actions with no regard for the harm they caused to Plaintiffs and others; and
   e. Making material misrepresentations with the intent that they should be acted upon by Plaintiffs in that Plaintiffs should believe that his actions were proper, appropriate, and medically necessary and should not believe she had been sexually assaulted or that she should question his actions and should not be aware of a possible cause of action that she had against him and/or UVU.

100. As a direct and proximate result of Pickering's unlawful conduct, Plaintiffs suffered emotional distress, humiliation, embarrassment, mental distress, anxiety, and other damages in an amount to be proven at trial, but which are greater than $300,000 each.

101. Pickering's actions were not medically necessary—they were acts of sexual battery which he knowingly and intentionally performed for no other reason than his own sexual gratification.

102. Pickering concealed his actions under the guise of medical care, shattered the trust placed in him, and committed these wrongful actions with no regard for the harm they caused to Plaintiffs.

## THIRD CAUSE OF ACTION
### (Sexual Assault Against Pickering)

103. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

104. When Pickering approached Plaintiffs, he intended to cause apprehension of an imminent harmful and offensive contact with their persons.

105. As a result of Pickering's acts, Plaintiffs were in fact placed in apprehension of imminent harmful and offensive contact with her person.

106. In performing the acts set forth above, Pickering acted with the intent of making contact with Plaintiffs' person.

107. At no time did Plaintiffs consent to any of Pickering's acts as set forth above.

108. As a direct and proximate cause of Pickering's unlawful conduct, Plaintiffs suffered emotional distress, humiliation, embarrassment, mental distress, anxiety, and other damages in an amount to be proven at trial, but which are greater than $300,000 each.

109. Pickering's actions were not medically necessary—they were acts of sexual assault which he knowingly and intentionally performed for no other reason than his own sexual gratification. Pickering concealed his actions under the guise of medical care, shattered the trust these Plaintiffs and countless others placed in him, and committed these wrongful actions with no regard for the harm they caused to Plaintiffs and others. As a result of these willful and deplorable actions, Pickering is liable for punitive damages and all attorney fees and costs expended in this action.

**FOURTH CAUSE OF ACTION**
**(Fraud against Defendants)**

110. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

111. Defendants represented to Plaintiffs that Pickering was a trustworthy provider who would provide proper care.

112. When Pickering made this material misrepresentation, he knew it was false and knew that he was committing acts which were not appropriate or medically necessary.

113. Pickering made material misrepresentations with the intent that they should be acted upon by Plaintiffs in that Plaintiffs should believe that his actions were proper, appropriate, and medically necessary and should not believe they had been sexually assaulted or that they should question his actions and should not be aware of a possible cause of action that they had against him and/or UVU.

114. Upon information and belief, UVU knew the above-referenced representations were false, or made them recklessly, knowing they had insufficient knowledge upon which to base such representations.

115. UVU intended that Plaintiffs rely on the representations, and failed to take appropriate actions to protect Plaintiffs and others from Pickering in an effort to protect the reputation and revenues of UVU and to avoid legal liability.

116. Plaintiffs relied on Defendants' representations and remained confused and unaware about the true nature of Pickering's actions.

117. As a direct and proximate result of Defendants' unlawful conduct and fraudulent misrepresentations, Plaintiffs suffered severe emotional distress, fear, embarrassment, nervousness, anxiety, worry, shame, humiliation, distress, shock, other mental and emotional harm as detailed above, and other damages in an amount to be proven at trial, but which are greater than $300,000 each.

118. Plaintiffs' 'reliance on Defendants' representations were a substantial factor in causing Plaintiffs' harm because, if they did not rely on those representations, they would not have met with Pickering, and he could not have sexually abused them.

**FIFTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress Against Pickering)**

119. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

120. Pickering intentionally engaged in acts of sexual battery against Plaintiffs, acts considered outrageous and intolerable as they offend generally accepted standards of decency and morality.

121. Pickering intended to cause emotional distress as he sought his own sexual gratification, and any reasonable person would have known that sexually battering vulnerable women under the guise of medical care would result in the infliction of emotional distress.

122. Pickering's conduct proximately caused Plaintiffs to suffer severe mental and emotional distress which manifested as depression, anxiety, horror, grief, shame, embarrassment, humiliation, feelings of being violated, extreme self-consciousness, aversions to male providers, distrust of male providers, and other harms as stated above.

## PRAYER FOR RELIEF

WHEREAS, Plaintiffs pray for relief against Defendants as follows:

A. An award of actual damages as proven at trial on all appropriate claims in the Complaint;

B. An award of all statutory damages as allowed by federal and state law;

C. An award of pre-judgment and post-judgment interest as allowed by law;

D. An award of costs and attorney fees incurred by Plaintiffs herein as allowed by law; and

E. Any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action for which a jury is permitted.

DATED this 11th day of September, 2024.

GROSS & ROONEY

*/s/ J. Adam Sorenson*
*Attorneys for Plaintiffs*